MONTGOMERY (BOUDEREAU v.). See Case No. 1,694.

MONTGOMERY (CHISHOLM v.). See Case No. 2,686.

MONTGOMERY (FAY v.). See Case No. 4,709.

MONTGOMERY (GRESHAM v.). See Case No. 5,805.

MONTGOMERY (RICE v.). See Case No. 11,753.

---

## Case No. 9,736.

MONTGOMERY et al. v. The T. P. LEATHERS.

[Newb. 421.] [1]

District Court, E. D. Louisiana. Nov., 1852.

SALVAGE—ACTUAL SAVING NECESSARY—SURRENDER BY MASTER—RIGHT OF PILOT TO PARTICIPATE—DERELICT—RATE OF SALVAGE—BY WHAT GOVERNED.

1. To constitute a derelict in the sense of maritime law, it is necessary that the thing be found deserted or abandoned upon the seas, whether it arose from accident, or necessity, or voluntary dereliction.
[Cited in Williams v. The Jenny Lind, Case No. 17,723.]

2. The abandonment of a steamboat by the master, to the care and protection of the master and crew of another steamboat for the purpose of procuring assistance and safety, is not a case of derelict.

3. In questions of salvage, no distinction can be made between the boat and cargo, both being subject to the same rule of law.
[Cited in The Queen of the Pacific, 18 Fed. 701.]

4. A salvage compensation can be awarded only to persons by whose agency and assistance the vessel or cargo may be saved from impending peril, or recovered after actual loss; and salvage will not be allowed unless the property be saved in fact by the parties who make the claim. Intentions, however good, and exertions even though they be perilous and heroic, are not sufficient to sustain a claim for salvage.
[Cited in The Williams, Case No. 17,710.]

5. The drawing a boat off when aground, is a common act of courtesy among steamboats, for which no claim for salvage is ever asserted.

6. The surrender of the imperiled boat by its master, to the care and protection of the master and crew of the steamer Robb, virtually dissolved the contract between the surrendered boat and its pilot, and the pilot by important services subsequently rendered beyond the line of his duty, as such, is entitled to claim as one of the salvors.

---

[1] [Reported by John S. Newberry, Esq.]

7. The rate of salvage is not governed by the mere extent of labor. The value of the property saved, the degree of hazard in which it is placed, the enterprise, intrepidity and danger of the service, and the policy of a liberal allowance for timely interposition of maritime assistance, all conspire to increase the amount of the salvage. When the value of the property is small and the hazard great, the allowance is in greater proportion; on the other hand, when the value is large and the services highly meritorious, the proportion is diminished.

[This was a libel by Edward Montgomery and others against the steamboat T. P. Leathers and cargo, for salvage.]

Mr. Benjamin, for salvors.
Mr. Durant, for respondent.

McCALEB, District Judge. The libelants in this case claim a salvage compensation for services rendered in saving from loss by fire, the steamboat T. P. Leathers. It appears from the evidence, that the steamboat James Robb, while prosecuting her voyage from this port to that of Louisville, Kentucky, on the 13th of June last, discovered the Leathers on fire, at College Point, about sixty miles above this city. The discovery was made about two o'clock in the morning. The Robb, upon being hailed by the Leathers, went to her assistance, and found her in a very dangerous situation; the fire was in her hold, and all efforts to extinguish the flames had proved ineffectual; she had been run hard ashore on a sand bank, with a view to save the lives of those on board; she had been scuttled by boring into her a number of large auger holes, for the purpose of extinguishing the fire. All the steam and water from her boilers had been exhausted by being discharged into her hold; by this means the flames were at first partially subdued, but again broke out as fiercely as before; she had already obtained the assistance of the steamboat St. Charles, which had vainly endeavored to pull her off the sand bank and extinguish the fire. When the Robb arrived, the flames had made such progress as to render inevitable the destruction of the Leathers and that portion of the cargo which had not been removed by the St. Charles. The Leathers was commanded by Captain J. F. Leathers, but when the fire broke out, he requested his older and more experienced brother, who was on board as a passenger, to take command. This request was complied with, and the latter had the control of the burning boat when the Robb arrived. With the assistance of his brother, he was engaged in doing all that skill, experience and energy could accomplish, with the means at his disposal, in rescuing the boat and cargo from impending peril. At his request, the Robb, aided by the St. Charles, hauled the Leathers off the sand bank. She took on board the passengers, and a large portion of the cargo from the deck of the Leathers, which had not been previously taken off by the St. Charles. She pumped the boilers of the Leathers, which were

empty, full of water, and after giving all the assistance she could for about four hours, was on the eve of leaving the Leathers and prosecuting her voyage to Louisville, when the captain of the Leathers requested Captain Montgomery not to leave, as it was, perfectly apparent the boat must inevitably be destroyed without the superior equipments of the Robb, to aid in putting out the fire. The testimony of Captain Leathers shows that he had no hopes whatever of being able to save the boat without that aid which the Robb only could render. He therefore came to the conclusion to abandon the burning boat to Captain Montgomery, of the Robb, that he might do with her whatever he might deem expedient, with a view to her final safety.

Captain Montgomery thereupon took possession of the Leathers, and with all the means and machinery of the Robb, resorted to every device which skill and ingenuity could suggest to save her. It may be proper here to remark, that the Robb is the only boat on the Mississippi provided with an extra steam engine to furnish steam and water for extinguishing fires. This engine, with its boiler, the main engine and its boilers, and the small engine called the doctor, on the Robb, were all fitted up with extra pipes leading into the hold of the Leathers. The two main engines of the Leathers and her doctor, were also fitted up with similar pipes, which were made to lead into her hold. Steam was then raised in the boilers on both boats, and an unremitted discharge of steam and water kept up. By this means, the flames were in a great measure subdued, but not entirely extinguished. The heat in the hold was so intense, and the smoke so suffocating, as to render it impossible for any one to go below. It was deemed advisable, therefore, to fill the hold with water as the only means of entirely putting out the fire. The Leathers was then towed by the Robb from College Point, where she had been stranded, to Valcour Aime's plantation, six miles lower down the river, to a sand bank where there was about six feet of water. While the boat, however, was proceeding down the river to the point here designated, it was found that the current of air created by her motion had the effect of driving back from the hatches the steam and smoke; and Captain Montgomery determined, though at considerable hazard of his life, to take a hose and descend into the hold, that he might thus be enabled more effectually to direct a stream of water upon the burning cargo. He was urgently warned not to do so by the officers of the Leathers, who informed him that there were barrels of turpentine in the hold; and notwithstanding the peril he incurred, he called for volunteers to aid him in the accomplishment of his purpose, and followed by James Dean, the pilot of the Robb, James F. Smith, her first clerk, James K. Moody, second clerk, Marshall Johnson, her first engineer, and Chas. Pierce, pilot of the Leathers, descended into the hold with a

hose in his hand, while Dean was provided with another. They were thus enabled, with the assistance of the other men, Smith and Johnson. Moody and Pierce, to direct a perpetual stream of water upon those articles of merchandise which were actually blazing. They were thus enabled by constant exertions for several hours, to extinguish the flames entirely, and save the boat and that portion of the cargo not already taken on board the Robb. The gallantry and intrepidity displayed by Captain Montgomery and his associates, will be fully appreciated by a reference to the fact disclosed by the evidence, that some of the barrels containing turpentine were on fire, and had their hoops burnt off. The water in the hold of the Leathers was then pumped out, the freight which had been taken from her on board the Robb was returned to her, and after about thirteen hours of unremitted labor, the Robb continued her voyage to Louisville, in charge of her mate, while Captain Montgomery took command of the Leathers, and brought her down in safety to this port.

The facts here detailed, and the testimony of the witnesses not particularly referred to, are such as to justify the court in regarding the services of the salvors as in the highest degree meritorious. It cannot be denied that almost all those ingredients of a salvage service, which in the opinion of a court of admiralty, enhance the claim for compensation, were strongly presented on the trial of this cause. The danger to the property rescued was imminent. The testimony of Captain Leathers shows clearly that it would inevitably have been destroyed but for the timely assistance of the salvors. In the conduct of Captain Montgomery were displayed all those qualities of skill, energy, intrepidity and gallantry, which ever have and ever will, appeal most strongly to the equitable consideration of courts in awarding a salvage compensation. The same qualities were exhibited, though not to the same extent, by those who promptly responded to his call for volunteers, and faithfully executed his orders. The proctors for the respondents have with commendable liberality, admitted that the services performed by the salvors were of a highly meritorious character, and that a liberal remuneration should be awarded. They have, however, very properly contended, that this is not a case of a derelict, as that term is understood in the maritime law, and however much I may feel inclined to regard with favor the services of these salvors, it is my duty to adhere as closely as possible to the well established principles of law. I cannot give to the case any other character than that which the law has given it. If it could be considered as a case of derelict, I should perhaps have little hesitation in decreeing the usual proportion of a moiety. But a glance at the law will show, that it would be a deviation from all precedent thus to regard it.

To constitute a derelict in the sense of the maritime law, it is necessary that the thing be found deserted or abandoned upon the seas, whether it arose from accident or necessity, or voluntary dereliction. Sir William Scott, in the case of The Aquila, 1 C. Rob. Adm. 37, declared that a legal derelict is, properly, where there has been an abandonment at sea by the master or crew, without hope of recovery. With the view, for which the words "without hope of recovery," are introduced, viz: to distinguish a temporary absence from a permanent abandonment, it might, perhaps, have been more proper to have said, an abandonment without the intention of returning, since the spes recuperandi might exist even though the abandonment were without such intention. In another case, that of The Jonge Johannes, 4 C. Rob. Adm. 263, the same learned judge seems to have entertained an opinion, that if a vessel be captured, and afterwards abandoned by her captor, it is not properly a case of derelict; because neither the owner nor those who were in possession as his agents, have committed any act of dereliction. So that in this view, to constitute a derelict, there must be a voluntary abandonment by the master and crew. But this opinion, as appears from later cases (The Lord Nelson, Edw. 79, and The Blenden-Hall, 1 Dod. 414), has been silently retracted; and certainly it is not the recognized doctrine in this country. Sir Leoline Jenkins has given a true definition in its most broad and accurate sense, when he says "derelicts are boats or other vessels forsaken or found on the seas without any person in them." Works of Sir L. Jenkins, vol. 1, p. 89. It is true that the civil law attached a very different sense to the term; for a thing was not a derelict in that law unless the owner voluntarily abandoned it without any further claim of property in it. "Pro derelicto antem habetur quod dominus ea mente abjecerit, al id in numero rerum suarum esse nolit." Just. Inst. lib. 2, p. 681, § 46. And, therefore, a thing cast overboard in a storm to lighten a vessel, was not esteemed a derelict. Rowe v. The Brig [Case No. 12,093].

In the case now under consideration, the boat on fire was found in possession of her captain and crew, who never left her at any moment from the commencement of the danger until the final extinguishment of the flames. It is true that Captain Leathers abandoned her to the possession of Captain Montgomery, under the conviction that nothing could be effectually done for her safety, without the admirable equipments of the Robb. But such an abandonment can, in no just or legal sense, be considered as sufficient to satisfy us in regarding the boat as a derelict—that is deserted by her captain and crew sine animo revertendi. A case of the total abandonment of a vessel upon the Mississippi must very rarely occur, especially where, as in this instance, she is stranded near the shore. The inducements to seek safety by the desertion of a ship in flames on the high

seas, or driven about in a helpless condition by storms, or wrecked on the coast of the sea, can never exist on our public navigable rivers. Being satisfied that this is not a case of derelict, I shall, instead of a moiety, award one-third of the proceeds of the property saved to the salvors, to be distributed as hereafter directed.

The position assumed by the proctors of the claimants of a portion of the cargo, that a distinction should be drawn by the court between the boat and cargo, cannot be recognized as the correct rule, in cases of this nature. I know no precedent for the establishment of such a rule, and the learned proctors have referred to no authority in support of their position. The reason advanced for the distinction, which it is contended should be drawn, is the fact that less exertion and risk were necessary in saving that portion of the cargo which was placed upon the deck of the Leathers. There is scarcely a case of salvage that ever came before a court of admiralty, in which this distinction would not have been applicable; and yet, we find the uniform rule to be, to consider the service performed in rescuing the vessel and cargo, as one general salvage service, to be compensated by awarding a certain quantum of the proceeds of the whole property. I have searched with diligence for authorities upon this point, and the only case I have discovered, is that of The Vesta, decided by Sir Christopher Robinson. 2 Hagg. Adm. 195. The decision was given upon an appeal from the commissioners, and although the learned judge confirms the action of these commissioners for satisfactory reasons, he is clear in the expression of an opinion adverse to the principle contended for by the proctors in this case. He maintains, that it is not a correct principle in determining the amount of salvage, to give specific proportions of different parts of the property saved as of the ship and cargo, and the different parts of the cargo. Such a rule is inconvenient in itself, and must lead to error, unless checked by proper attention to the adequacy of the remuneration so assigned, according to the circumstances of the particular case. The more usual and better rule is, to make a valuation on the whole property. "Suppose," says the judge, in illustration of his views on this point, "a casket of jewels on board, and which might be saved with great facility; it could not, in such case, be contended that the salvors would only be entitled to a small gratuity for carrying it on shore. To uphold such a notion would lead to preferences in saving one part of a cargo before another." I shall, therefore, adhere to the usual rule, and decree compensation out of the whole proceeds of boat and cargo; and shall do so with greater satisfaction, because it appears from the testimony of Captain Leathers, that there existed the strongest apprehensions that the deck of the burning boat would fall in, and the cargo on the deck could only be saved by directing a constant stream of water into the hold, by the operations of the engine and hose of the Robb.

I come now to consider the claim of the St. Charles to be considered as a salvor; and I shall proceed to state as briefly as possible, the reasons why, in my judgment, the claim cannot be admitted. A salvage compensation can be awarded only to persons by whose agency and assistance the vessel or cargo may be saved from impending peril, or recovered after actual loss, as in cases of shipwreck, derelict or recapture. It is well settled, that unless the property be saved in fact, by those who claim as salvors, salvage will not be allowed, be their intentions however good, and their exertions however heroic and perilous. Clarke v. The Dodge Healy [Case No. 2,849]. The evidence shows that a large portion of the cargo on deck, was taken on board of the St. Charles. But by an agreement between Captain Leathers and Captain Applegate, commanding the St. Charles, that portion of the cargo was transported by her to its place of destination, and her captain and owners were to be compensated by receiving the freight which was chargeable thereon. This freight was doubtless received. Whether it has been or not, it is certain that no claim for salvage has or could now be asserted against that portion of her cargo. It can hardly be contended that the Leathers and the balance of the cargo were saved when the St. Charles left her. The testimony of Captain Leathers on this point, is too explicit to admit of a doubt. The St. Charles aided the Robb in drawing the Leathers off the sand bar; but we are told by the pilot of the Leathers, that the power of the Robb was sufficient without her. Besides, the drawing a boat off when aground, is a common act of courtesy among steamboats, for which no claim for salvage is ever asserted. If the services of the Robb had extended no farther than this simple and usual act of courtesy, it is hardly probable that she would have asserted any claim for salvage compensation. But she persevered unto the end. She not only rendered the services alluded to by the witnesses, but it was by those services that the property against which she has filed her libel was actually saved from impending peril. I am of opinion that the St. Charles has already been amply compensated by the amount of freight she has received upon that portion of the cargo which by agreement with Captain Leathers—an agreement which seems at the time to have been perfectly satisfactory to both parties—she was to carry to its point of destination.

The proctors for the claimants of a portion of the cargo, have urged upon the court the propriety of decreeing salvage to the crew of the Robb. I cannot perceive upon what ground their clients are interested in securing to the crew their customary proportion of the compensation awarded, except upon the supposition that as that proportion has not been claimed, it will enure to the benefit

of the claimants. But if by the evidence the crew were placed before the court as salvors, I should feel it my duty to have their proportion retained in the registry, subject to their orders, and in no event would I feel myself authorized to order it into the hands of the claimants. The evidence, however, does not justify the court, in this instance, in considering the crew as salvors. They have asserted no claim as such, and the fair presumption is, that, not having performed any service beyond the ordinary line of their duty, they have no demand to make beyond their ordinary wages. If, indeed, the court could feel itself called upon to award to them a compensation, the amount would necessarily be about the proportion of stipulated wages, which, for about thirteen hours, would be too insignificant to be taken into account in a case like this. I have felt it to be a sacred duty to guard the rights of the crew in all cases in which they could at all be regarded as salvors. And in the case to which the proctor has referred, I refused to award to the owners of the tow-boat the amount of salvage compensation which was justly demanded by the crew, under the belief that they would eventually claim as salvors, and because I was convinced their claims had not been properly presented by those whose duty it was to protect their rights. The only persons who now appear before the court as salvors, are Captain Montgomery, the men whose names have already been mentioned, and Hamilton Smith and Isaac Darrimore, the mate and carpenter. These two last did not descend into the hold of the Leathers, but rendered prompt and efficient assistance in executing orders above, and especially in cutting holes in the deck. They incurred no real danger, but were active and useful in their appropriate sphere. Charles Pierce, although a pilot on the burning boat, is clearly entitled to be regarded as a salvor. His original contract with the boat, on which he was employed, was virtually dissolved by the surrender of the boat into the possession of Captain Montgomery; and there seems to be no doubt that he performed important services beyond the line of his ordinary duty. I shall, therefore, place him upon an equality with James S. Smith, Marshall Johnson and James K. Moody. After Captain Montgomery, the real dux facti—the strong prevailing mind that led throughout the enterprise—I consider the pilot of the Robb, James Dean, as first entitled to the favorable consideration of the court. He was the first to respond to the call of Captain Montgomery for volunteers, and to follow him into the hold. He also had charge of a hose, and amid the intense heat and suffocating smoke, continued, with great fortitude and energy, to discharge his duty until the flames were finally extinguished.

Since the decision of Lord Stowell in the case of The Raikes [1 Hagg. Adm. 246] it has become customary with courts of admiralty to award a liberal compensation to the owners of steam vessels to induce them to embark in a salvage enterprise and thus enlist their powerful and efficient aid in rescuing life and property from impending peril. The case now under consideration is one in which a higher proportion than one-third should be awarded to the owners of the salving boat. The superior engine of the Robb and her other excellent and extensive equipments, all so admirably adapted to the service in which she was employed, will, I think, justify me in deviating from the ordinary rule of one-third, and giving to her owners one-half of the salvage compensation awarded. It should also be remembered, in further justification of this rule, that her exertions to save the property in this instance worked a forfeiture of her insurance. As already intimated, I shall decree one-third of the proceeds of the boat and cargo saved free of all expenses and charges, as the aggregate of salvage compensation; and of this one-half having been decreed to the owners of the Robb, I shall divide the other half into thirty shares, of $250 each. I give—

To Captain Montgomery ........... 12 shares
  James Dean, pilot............... 4 "
  James S. Smith................. 3 "
  Marshall Johnson............... 3 "
  James K. Moody................. 3 "
  Charles Pierce................. 3 "
  Hamilton Smith................. 1 "
  Isaac Darrimore ............... 1 "
                                  ——
                                  30 shares

Thirty shares of $250 each, are equal to $7,500. The whole value of the property saved has been estimated at $45,000. The owners of the Robb will receive the other half of the third allowed, viz: $7,500.

In making this decree, I have endeavored to give what I consider, under all the circumstances of the case, a liberal reward to the salvors, and at the same time protect the rights of the unfortunate owners. It is well established that the amount of salvage rests in the sound discretion of the court. The rate is not governed by the mere extent of labor, but is a result from the combination of various considerations. The value of the property saved, the degree of hazard in which it is placed, the enterprise, intrepidity and danger of the service, and the policy of a liberal allowance for the timely interposition of marine assistance, all conspire to heighten the amount. Where the value of the property is small, and the hazard is great, the allowance is always in greater proportion. On the other hand, where the value is large, and services are highly meritorious, the proportion is diminished.